UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CORINNA CREEDON,<br><br>                              Plaintiff,<br><br>                - against -<br><br><br>FORVIS MAZARS, LLP, RYAN REIFF,<br>MICHAEL WOLFE, and TROY GILSTORF,<br><br>                              Defendants. | **Case No. 25-cv-8499**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Corinna Creedon, by and through her undersigned counsel, Kalmanson Cohen, PLLC, alleges the following upon personal knowledge as to her own acts, and upon information and belief as to all other matters:

## PRELIMINARY STATEMENT

1.      Defendant, Forvis Mazars LLP ("Forvis" or the "Company" or the "Firm") is a US-based entity that is a member of Forvis Mazars Global, a large accounting and audit services firm which, according to its website, has over 40,000 professionals and operates in over 100 countries.

2.      At all relevant times, Ms. Creedon was a star performer for the Company. At the time of her termination, she led Forvis's National Nonprofit Advisory Services practice (with a team of approximately 65 professionals in over 13 offices) and the New York Metro Area's Advisory Services Practice and the New York Area Outsourced Accounting Services Practice (with a team of up to 9).

1

3.     Ms. Creedon achieved this tremendous success despite performing against a backdrop of pervasive misogyny wherein she was regularly asked to take less compensation than that to which she was entitled and was regularly subjected to gender-based mistreatment.

4.     The all-male senior leadership team's disdain for Ms. Creedon was open and notorious.

5.     For example, on one occasion, Defendant Gilstorf, to whom Ms. Creedon indirectly reported, drunkenly crossed a crowded room of senior executives to shake the hand of Ms. Creedon's husband, loudly remarking, that he "always wanted to meet the man who puts up with this pushy broad."

6.     But the misconduct went far beyond jokes made in poor taste—of which there were many.

7.     Ms. Creedon was an extraordinary producer and one of the highest revenue earners at the Firm.

8.     However, rather than celebrate her successes, her male supervisors instead, berated her for earning too much money.

9.     They also told her that she should give up some of her hard-earned bonus.

10.    Ms. Creedon is not aware of a single male employee at Forvis subjected to similar treatment.

11.    From the time of her hire in 2019, the negotiation of each of her successor contracts was extraordinarily delayed, leaving her to work without the protection of an employment agreement for the better part of a year.

2

12. These delays were the result of Defendants Ryan Reiff and Troy Gilstorf's refusal to engage with the woman they deemed greedy, despite their own enhanced earnings as a result of her success.

13. Again, to Ms. Creedon's knowledge, no man at her level was repeatedly subjected to egregiously protracted contract renewals and forced to work without the protection of an employment contract.

14. Since Ms. Creedon's bonus payment in 2021, and every year thereafter, Mr. Reiff disputed her bonus eligibility and its calculation, despite the precedent of each previous year's computation, then delayed its distribution beyond the contractually-mandated payment date.

15. To Ms. Creedon's knowledge, no man at her level was repeatedly delayed bonus distribution beyond its contractual pay date, nor attacked for the amount of earnings he accrued pursuant to the bonus/compensation formula.

16. Nevertheless, for years, Ms. Creedon let it roll off of her back, that is, until the abuse and discrimination became intolerable.

17. Ms. Creedon complained—for over a year—to her boss, Defendant Reiff, that she was being harassed on account of her gender by a male employee ("Mr. H").

18. Ms. Creedon also dutifully reported complaints of sexual harassment on behalf of *other* women against Mr. H to Mr. Reiff and Human Resources ("HR") in accordance with her responsibility as a supervisor, and in accordance with Firm policy.

19. In response, Mr. Reiff did nothing to correct the situation, and instead, embarked on a campaign of retaliation against Ms. Creedon because of her protected complaints.

20.     After months of Mr. H's unrestricted and worsening treatment of multiple women at the Firm, including Ms. Creedon, Ms. Creedon reported the sexual harassment further up the chain of command, which *finally* forced the Firm to take the complaints seriously.

21.     HR investigated and found the women's complaints to be credible.

22.     On December 13, 2024, Forvis' Chief Risk Officer, Michael Wolfe, informed Ms. Creedon that the Firm had found Mr. H's behavior to be unacceptable and had fired him— effectively immediately.

23.     Shockingly, during that same conversation, he fired Ms. Creedon, too.

24.     Mr. Wolfe was explicit—Ms. Creedon was being fired for having made protected complaints; *i.e.*, for patently retaliatory reasons.

25.     This action followed.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) (4). This Court has supplemental jurisdiction over Plaintiff's claims brought under New York State and City law pursuant to 28 U.S.C. § 1367 as those claims are so related to the federal claims in this action such that they form part of the same case or controversy.

27.     Because the claims asserted herein arise out of, or are otherwise related to, the sexual harassment and gender-based discrimination, this case cannot be subject to mandatory arbitration pursuant to the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021.

28.     Venue is proper in the Southern District of New York because a substantial part of the events and omissions giving rise to the claims set forth herein occurred in this District.

29.     On or about May 22, 2025, Ms. Creedon filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), alleging sex and gender discrimination and retaliation.  On August 1, 2025, the EEOC issued Ms. Creedon a Right to Sue Notice.  Therefore, Ms. Creedon has exhausted all administrative pre-requisites to this filing.

## PARTIES

30.     Plaintiff Corinna Creedon is a woman living in Nassau County, New York.  She was employed at Forvis (and its predecessor entities) as a Managing Director from November 2019 until March 3, 2025, when the Company ultimately terminated her employment.

31.     Ms. Creedon was assigned to the New York office during the entirety of her tenure with the Firm.

32.     Upon information and belief, Defendant Forvis is established under the laws of the State of Delaware, has a principal place of business in Kansas City, MO, and regularly does business in the State of New York.

33.     Upon information and belief, Defendant Ryan Reiff, is an individual and citizen of the State of New York, and the Managing Partner of Forvis' New York office.  At all relevant times, Ms. Creedon reported to Mr. Reiff. Mr. Reiff had the authority to control the terms and conditions of Ms. Creedon's employment, oversaw all employees in New York, made decisions with regard to hiring and firing in New York, and acted as employer within the State of New York.

34.     Upon information and belief, Defendant Michael Wolfe, is an individual and citizen of the State of Missouri, and the Chief Risk Officer of Forvis.  At all relevant times, Mr. Wolfe had the power to hire and fire New York-based employees, oversaw multiple employees in New York, and acted as employer within the State of New York.  In addition, upon information and

belief, Mr. Wolfe was responsible for overseeing the Firm's belated investigation into Ms. Creedon's allegations of sexual harassment on behalf of herself and others.

35.     Upon information and belief, Defendant Troy Gilstorf, is an individual and citizen of the State of Indiana, and the Northeast Regional Managing Partner of Forvis.  At all relevant times, Ms. Creedon indirectly reported to Mr. Gilstorf.  Mr. Gilstorf had the authority to control the terms and conditions of Ms. Creedon's employment in New York, oversaw Mr. Reiff, was responsible for the financial results of the New York geographic practice unit, made decisions with regard to overall New York office practice management, and acted as an employer within the State of New York.

## FACTUAL ALLEGATIONS

### Background

36.     Ms. Creedon began working at BKD LLP ("BKD") as a Managing Director in November 2019.

37.     After a series of acquisitions and mergers, Ms. Creedon's employer became Forvis Mazars, LLP.[1]

38.     Between November 2019 through the termination of her employment in 2025, Ms. Creedon directly reported to an all-male senior leadership team.

39.     At all relevant times, Ms. Creedon reported to New York Metro Area Managing Partner, Ryan Reiff, who in turn, reported to the Northeast Regional Managing Partner—a position

---

[1] On June 1, 2022, BKD CPAs and Advisors ("BKD") merged with Dixon Hughes Goodman LLP ("DHG") to form FORVIS LLP. Then, on June 1, 2024, FORVIS LLP acquired Mazars, to become Forvis Mazars, LLP, a member of Forvis Mazars Group, LLP. Hereinafter, for purposes of this Complaint, "Forvis" refers, collectively, to FORVIS LLP, Forvis Mazars, LLP as well as the predecessor entities that employed Plaintiff.

held by initially Rob Pruitt, and later, Troy Gilstorf.   Ms. Creedon had a "dotted line" reporting

to Michael Wolfe.  All individuals ultimately reported to CEO, Tom Watson.[2]

40.    In November 2019, Ms. Creedon signed an employment agreement with BKD that

outlined the terms of her employment, including her base salary and bonus formula (known,

internally, as the "$HARE Bonus" or "Bonus").

41.    Ms. Creedon's Bonus was calculated using a formula based on Forvis' revenue

attributable to Ms. Creedon's efforts.

42.    Over the years, the parties renegotiated the financial terms of Ms. Creedon's

compensation package through successor contracts, with her last contract expiring on May 31,

2024 (the "Employment Agreement").

43.    Each time Ms. Creedon's contract was up for renewal, she was  forced to work

without a contract for many months.

44.    Upon information and belief, the Firm did not subject Ms. Creedon's male

counterparts to this financial insecurity.

45.    A true and correct copy of the Employment Agreement is attached hereto as

Exhibit A.

46.    The Employment Agreement purports to incorporate certain restrictive covenants

from Ms. Creedon's original contract, which, for the reasons set forth herein, are unenforceable.

---

[2] Ms. Creedon did have a dotted line reporting relationship to one woman, Tondee Lutterman, the National Non-Profit Leader, but Ms. Lutterman did not regularly oversee Ms. Creedon's work. Rather, Ms. Lutterman was involved solely in Ms. Creedon's work in the non-profit practice and was not involved in decisions about Ms. Creedon's compensation, contract, or other terms of her employment.

47.     A true and correct copy of Ms. Creedon's original employment agreement is attached hereto as Exhibit B.

*Ms. Creedon was a Star Performer for Forvis*

48.     Ms. Creedon holds accounting and international business degrees from NYU Stern School of Business and is a New York State-licensed Certified Public Accountant.

49.     Prior to her termination, Ms. Creedon started and led the Company's National Nonprofit Advisory Services practice and the New York Metro Area's Advisory Services Practice as well as the New York Outsourced Accounting Services Practice.

50.     Ms. Creedon also spearheaded the creation of the Nonprofit Digital Technology Strategy & Innovation team's formation and served as its National Leader.

51.     Throughout her tenure, Ms. Creedon consistently received positive feedback and reviews (formal and informal), and regularly won awards and recognition both internally and externally in the accounting community.

52.     Mr. Reiff and Mr. Gilstorf publicly celebrated Ms. Creedon for consistently generating—by far—the most new revenue of any Managing Director or Partner in the New York office.

53.     Privately, however, their sentiments were far more sour.

54.     Ms. Creedon's realization rate (*i.e.*, her profitability) was among the highest *in the entire Firm*—with realization rates of between 95-115% on her work—significantly higher than the Firm's average.

55.     Both Forvis and industry peers repeatedly recognized Ms. Creedon's efforts and success.

56.     For example, *inter alia*, Ms. Creedon was honored in:

- Crain's New York's *Notable Leaders in Accounting and Consulting* for each year from 2020 through 2024;

- Long Island Business News' *Top 50 Women in Business 2024* and *2025*;

- *Who's Who ~ Women in Professional Services on Long Island 2024;*

- *Premier Business Women of Long Island 2025;* and

- City and State of New York's *Long Island Trailblazers 2025*.

57.    In 2024, Forvis nominated Ms. Creedon to be its 2024 Key Award Partner in recognition for being a cultural ambassador of the Company's values, outstanding leadership and representation of Firm culture, and for her "commitment to living out our FORVIS DNA".

58.    Upon information and belief, Ms. Creedon was nominated for this award by at least three different people at the Firm.  Though she was not ultimately selected for the award, on May 17, 2024, CEO Tom Watson emailed Ms. Creedon, stating, *inter alia*:

> "[Y]ou should be very proud of this recognition by your peers as they acknowledge your commitment to living out our FORVIS DNA . . . . Thank you for serving as a role model of our values and a builder of our culture."

*Forvis Tolerated Sexual Harassment, Gender-Based Discrimination,
and a Hostile Work Environment*

59.    Throughout her employment the all-male leadership team at the Company regularly made gender-based comments to and about Ms. Creedon.

60.    This became overt when the Company was calculating Ms. Creedon's Bonus following her first full year of employment.  At that time, it was apparent that Ms. Creedon had already earned significantly in excess of the amount that Mr. Reiff had anticipated she would earn, both in terms of revenue for the Firm, and her related compensation.

61.    This, a win for both Ms. Creedon and Forvis, should have been celebrated, but instead, it was met with disdain.

62.     The then-Northeast Regional Managing Partner, Robert Pruitt[3] reprimanded Mr. Reiff for falling short on the projection of Ms. Creedon's revenue and resulting Bonus.

63.     Mr. Reiff, Mr. Pruitt and Mr. Gilstorf complained that Ms. Creedon earned too much money, and as a result, they regularly asked Ms. Creedon to take less than her full Bonus amount.

64.     Ms. Creedon endured comments like, "You have a husband with a good job."  Mr. Reiff even said, "If you take less, then the other partners in New York will be able to get more, and they need it, because they are underperforming."

65.     To Ms. Creedon's knowledge, no man was ever asked to take less than his full compensation or bonus, nor berated for the amount of revenue he generated for the Firm, and his attendant compensation.

66.     Mr. Reiff and others often characterized Ms. Creedon as "aggressive," "transactional," "opportunistic," "status and credit seeking," and "motivated by money," as though those characteristics were demerits on her character—microaggressions against her as a woman in a male-dominated field.

67.     To be sure, aggressive men who were motivated by money at the Firm were praised as "tough negotiators," and "good businessmen," and not referred to as "pushy broads."

68.     The Firm made no secret of its distaste for engaging in contract negotiations with her, and as a result, her contract negotiations took much longer than those of her male counterparts.

---

[3] The Company elevated Mr. Pruitt to Chief Growth Officer in or around January 2022.  Prior to his elevation, Mr. Reiff reported directly to Mr. Pruitt.

69.    Some of Ms. Creedon's male colleagues noticed the disparity between their contract negotiations and hers, and, on more than one occasion remarked that her treatment seemed to be discriminatory and unacceptable.

70.    To wit, the Company forced Ms. Creedon to work without a contract for more than 10 months following the expiration of her original contract, and for seven months following the expiration of her successor contract.

71.    To Ms. Creedon's knowledge, these protracted negotiations were unprecedented at the Firm.

72.    Then, at a partner retreat in Florida in November 2022, Mr. Gilstorf drunkenly made a shockingly loud and humiliating comment to Ms. Creedon's husband, stating, in sum and substance: "Oh this is the husband.  I've been looking forward to meeting you – I wanted to ask you – how do you put up with this pushy broad?"

73.    Though offensive, this was nothing new.  For years, Ms. Creedon had been demeaned as "pushy." In fact, foreshadowing this comment, a few months before partner retreat, Mr. Gilstorf had told Ms. Creedon during a contract negotiation, in sum and substance: "I want to meet your husband and find out how he deals with having such a **pushy** wife."

*Ms. Creedon Faced Sexual Harassment*

74.    In or around March of 2021, Ms. Creedon hired a Managing Consultant, who reported to her as Practice Leader, hereinafter known as "Mr. H".

75.    Initially, the relationship between Mr. H and Ms. Creedon was congenial.

76.    Ms. Creedon's management style is very inclusive. At Forvis, she sought to elevate everyone on her team, regularly affording even junior members access to clients, promoting their ideas as their own, and advocating for their success.

77.    It was no different with Mr. H.

78.    Nevertheless, Mr. H had a quick and volatile temper. Accordingly, Ms. Creedon made a conscious effort to provide him with regular and formal feedback about these issues, coach him, and even routinely sought out the guidance of her own coach, Mr. Reiff, to ensure that she was mentoring Mr. H properly.

79.    And in turn, Mr. Reiff consistently reassured and praised Ms. Creedon's approach to coaching Mr. H.

80.    However, Mr. H soon began to manipulate the very access that Ms. Creedon had provided to him.

81.    Mr. H was hostile and demeaning towards Ms. Creedon and made it a habit to publicly undermine her in front of both her New York and National teams, at conferences, and even in front of clients.

82.    There were many examples of this conduct.  For instance, during a June 2024 strategy meeting Mr. H angrily informed Ms. Creedon that (1) he thought she was "unfocused" because she was not focused on the areas and projects that *he* believed warranted her attention; (2) he was actively seeking other employment; (3) he was intentionally cutting her out of project meetings with existing and prospective clients; and (4) he was deliberately alienating her from her junior team members and excluding her from meetings to which she had requested access.

83.    Ms. Creedon informed Mr. H that these behaviors presented a significant risk to the Firm.  Mr. H appeared unbothered by this concern.

84.    Then, at a conference in July 2024, Mr. H disagreed with the manner in which Ms. Creedon planned to handle a presentation.  Rather than address it discreetly, he screamed at

her in front of prospective clients, clients, and other Forvis personnel, calling her idea "stupid," and "dumb."

85.     Having witnessed this confrontation, at least two senior-level Forvis employees advised Mr. H that this behavior was unacceptable and took time to admonish him about his conduct.

86.     In addition, during video calls, Mr. H routinely and repeatedly sent condescending and hostile messages to Ms. Creedon in all caps—over and over again—in sum and substance "STOP TALKING!", "WHY DID YOU SAY THAT?", "STOP STOP STOP!"

87.     Clients and internal peers noticed Mr. H's hostility towards Ms. Creedon.

88.     In fact, his conduct was so aggressive to Ms. Creedon that clients refused to work with him.  To wit, several Forvis clients conditioned their contract renewals on Forvis removing Mr. H from the account.

89.     Clients commented to Ms. Creedon and others in Forvis leadership about how aggressive and hostile Mr. H was towards women at the Company.

90.     Indeed, Mr. H's mistreatment of women in the workplace was no secret to Forvis.

91.     In fact, *three separate male partners and one female partner who were privy to Mr. H's conduct (as well as Ms. Creedon's protracted contract negotiations),* asked her for details, informing her that the Firm has a "serious problem retaining talented women at the senior leadership level."   These individuals indicated that it was their *duty* to report any sexual harassment that she had been facing and wanted Ms. Creedon's "permission" to speak on her behalf to her male supervisors to understand why this conduct was being tolerated.

92.     Ms. Creedon declined the offers, hesitant to make waves, knowing her already troubling reputation as a "pushy woman."  So, she attempted—time and again—to deal with the

gender-based harassment through direct reporting channels by bringing her concerns to her immediate supervisor, Mr. Reiff.

*Mr. H Harassed Other Woman at the Company*

93.      In or around Spring 2023, Mr. H began to prey on several women in the Dallas Fort Worth ("DFW") Nonprofit Advisory Services team.

94.      His treatment of the women on the DFW team was so insulting, misogynistic and demeaning that the team complained to their own Partner who informed Ms. Creedon that Mr. H should be removed from future projects with the women so as not to subject them to his sexual harassment.

95.      This same female DFW partner also informed Ms. Creedon that during the National Nonprofit Advisory Services Practice Retreat in March 2023, as mentioned, *supra*, many women came to her to note that Mr. H's treatment of and towards Ms. Creedon was offensive and belittling.

96.      In addition, they reported that within breakout sessions and throughout the retreat, Mr. H routinely spoke over the female members of the group, including the DFW partner, which they found disturbing and markedly gender-based.

97.      Mr. H did not treat men in this manner.

98.      As a result, the DFW partner told Ms. Creedon that she would only refer work to Ms. Creedon's Practice if Mr. H did not have a prominent role in the engagement due to his mistreatment.

99.      In or around the Summer of 2024, Mr. H also began to harass two female members of Ms. Creedon's team (the "Team Complainants," and each a "Team Complainant").

100.    On October 17, 2024, a Team Complainant sent Ms. Creedon a text message requesting to speak about "escalating problems" that she had been having with Mr. H and the resultant anxiety it had been causing her.

101.    Again, Mr. H did not treat men in this manner.

*Defendants Retaliated against Ms. Creedon*

102.    Ms. Creedon began ringing alarm bells about Mr. H's conduct within just months of his hire.

103.    Initially, she reached out to Mr. Reiff to seek guidance on how best to manage Mr. H's professional immaturity, volatile outbursts, impatience and other disrespectful behaviors.

104.    Mr. Reiff purported to have a conversation with Mr. H to caution him about his behavior, but otherwise took no action.  Instead, Mr. Reiff informed Ms. Creedon that she was doing a good job managing Mr. H.

105.    But without restraint from his supervisors, Mr. H's aggression towards women continued unabated, and throughout late 2023 and early 2024, Ms. Creedon *repeatedly* complained to Mr. Reiff about the gender-based harassment and requested his assistance.

106.    Ms. Creedon was explicit in her good faith complaints, stating that Mr. H's treatment was *on account of her gender*. She complained to Mr. Reiff, in sum and substance: "[He] does not respect me because I am a woman" and "[He] does not like having to report to a strong woman".

107.    Rather than address her complaints, Mr. Reiff dismissed them, responding that the two had a personality conflict.

*Mr. Reiff Refuses to Engage in Contract Renewal Discussions*

15

108.    Around this same time, in November 2023, Ms. Creedon first approached Mr. Reiff about executing her next employment contract, because her then-current contract was set to expire at the conclusion of the fiscal year, *i.e.*, May 31, 2024, and her prior contract had taken nearly a year to negotiate.

109.    Mr. Reiff stalled, refusing to participate in the contract renewal process for months.

110.    Then, in February 2024, Mr. Reiff purported to offer Ms. Creedon a Partnership role (as opposed to her remaining as a Managing Director).

111.    But when Ms. Creedon requested to see the proposed compensation terms, Mr. Reiff never sent them.

112.    Ms. Creedon reached out to Mr. Reiff about the same no fewer than five times between February and April 2024.  Mr. Reiff ignored Ms. Creedon until April 2024, when Ms. Creedon said, in sum and substance: "I guess the partnership isn't happening this year."

113.    Mr. Reiff confirmed that he had run out of time, flippantly stating, "my bad," and suggesting that the parties should negotiate another 1-year Managing Director contract.

114.    However, Mr. Reiff never sent a revised Managing Director contract, despite Ms. Creedon's many requests for the same.

115.    Yet again, Ms. Creedon found herself in the position of working without a formal employment agreement.

116.    Ms. Creedon is not aware of any man at the Firm with whom the Firm refused to engage in compensation negotiations in this manner.

*The Firm Refuses to Provide Resources to Ms. Creedon*

117.    Ms. Creedon regularly represented the Firm in marketing campaigns and, throughout her tenure there, was repeatedly given new mandates for the expansion of her practice across new industry verticals and geographic locations.

118.    In the fall of 2023, this was particularly true, and Ms. Creedon sought to expand her practices.

119.    However, at that same time, Mr. Reiff began to refuse to provide Ms. Creedon with appropriate resources to succeed in her many posts, something which had never previously been an obstacle (and which defies logic for an individual generating more business than any of her peers).

120.    As Practice Leader, Ms. Creedon had the right to hire and terminate staff for her New York teams, but had always made a business case with Mr. Reiff out of respect and for his visibility.

121.    In the fall of 2023, due to the increasing demands of her practices, Ms. Creedon needed to add a team member.  Ms. Creedon approached Mr. Reiff about this, who replied: "[You are] Greenlighted for staffing.  You keep growing, you can keep hiring".

122.    Then, when Ms. Creedon identified a well-qualified candidate for the role (who happened to be a female), Mr. Reiff refused to approve of the hire.  This denial came at the same time as Ms. Creedon was raising complaints to Mr. Reiff about Mr. H's misconduct.

123.    By the Spring of 2024, Mr. H had positioned himself to be the sole repository of key information needed for the practice group's success.  Therefore, given Mr. H's volatility, diminished performance, and threats to resign and take proprietary Firm information with him, Ms. Creedon expressed to Mr. Reiff that she needed the additional headcount to manage for succession vulnerability.

124.    Ms. Creedon informed Mr. Reiff of these difficulties, but still, for the first time, Mr. Reiff refused to let Ms. Creedon hire additional staff, which until that point had always been done at her discretion as Practice Leader.

125.    It made no economic or business sense.  Ms. Creedon paid her staff out of her own compensation, making a new hire a $0 expense for the Firm.

126.    It was only when Ms. Creedon looked to replace a man with a woman that Mr. Reiff stonewalled the decision and stripped her of her authority to do so independently.

*Forvis Promotes Mr. H Despite his Harassment*

127.    Meanwhile, in April 2024, Forvis promoted Mr. H to Director, at Mr. Reiff's behest, and over Ms. Creedon's documented concerns.

128.    Despite this blatant disrespect and tacit endorsement of Mr. H's behavior, Ms. Creedon's performance remained objectively excellent.  She brought in excess of $3 million to the Company during Fiscal Year 2024, representing nearly 30% of all Nonprofit business in New York and was recognized externally and throughout the Company for her achievements.

*Ms. Creedon is Forced to Fight for her Bonus*

129.    But then came time for the Company to pay Ms. Creedon's Bonus.

130.    Pursuant to her contract, the Firm was obligated to pay Ms. Creedon's annual Bonus by July 31st of each year.

131.    Each and every year, the Company paid Ms. Creedon's Bonus late .

132.    Ms. Creedon is not aware of any man who was made to wait for his bonus beyond his contractual date.

133.    On or about May 1, 2024, Ms. Creedon provided Mr. Reiff with her estimated calculation of the Fiscal Year 2024 Bonus in anticipation of the upcoming fiscal year-end.

134.    It was not until June 2024 that Mr. Reiff responded, providing his own calculation, which devalued her Bonus by nearly $250,000.

135.    Ms. Creedon noted that his 2024 calculation was incorrect and provided him with support for the same.

136.    Mr. Reiff ignored Ms. Creedon entirely and refused to answer or acknowledge her emails regarding the Bonus calculation.

137.    In the past, while Mr. Reiff had delayed Ms. Creedon's Bonus calculation, this time, he ignored her completely.

138.    Ms. Creedon pressed him, multiple times between June and July, and when he still failed to confirm the calculation, on or about August 2, 2024—*after* the contractual pay date for the Bonus—she informed Mr. Reiff that she expected the Bonus payment, per her calculation, to appear in the August 15th pay cycle.

139.    Mr. Reiff responded aggressively, demanding that they meet in person, both to discuss the Bonus and "something else."

140.    On August 6, 2024, the two met, and Mr. Reiff ultimately conceded that Ms. Creedon's Bonus calculation was correct and agreed to pay her.

141.    At that same meeting, however, Mr. Reiff informed Ms. Creedon that Mr. H had made a complaint about her, to wit, that she was not "prioritizing" the right goals, and that Mr. H reported feeling that she was holding him back.

142.    Ms. Creedon listened to Mr. Reiff relay Mr. H's so-called "concerns" without responding.  However, late into the conversation, Ms. Creedon finally broke down crying.

143.    At that time, Ms. Creedon, again, explained to Mr. Reiff the full extent of Mr. H's gender-based belligerence, hostility, and subversive and disrespectful actions.

144.    In response, Mr. Reiff appeared outraged on her behalf and acknowledged, finally, that this was not a personality conflict, but rather, that Mr. H was indeed, in Mr. Reiff's own words, "harassing" her.

145.    Mr. Reiff assured Ms. Creedon that the Firm would not tolerate Mr. H's behavior and offered to terminate his employment immediately.

146.    The following day, Ms. Creedon confirmed that she did not see a path forward for Mr. H at the Firm and then left for a pre-planned vacation with assurances of support from Mr. Reiff.

*Ms. Creedon Complained about Harassment Again;*
*Mr. Reiff Took no Action to Remedy the Situation.*

147.    When she returned, on or about August 7, 2024, Mr. Reiff completely backtracked on his acknowledgement of Mr. H's harassment.

148.    Despite Ms. Creedon's repeated pleas to dismiss Mr. H, Mr. Reiff did nothing.

149.    Mr. Reiff told her to document their interactions and let him know about any further developments.

150.    Ms. Creedon did as she was told, and emailed summaries of incidents to Mr. Reiff as they occurred, with mounting frequency.

151.    Again, Mr. H was emboldened, having been given a free pass to intensify his campaign of harassment.

152.    Throughout August and September 2024, for the first time in their 5-year relationship, Mr. Reiff began cancelling the standing meetings that he had historically had with Ms. Creedon.

153.    In September, after weeks of urging by Ms. Creedon, Mr. Reiff set up a meeting with Ms. Creedon and Mr. H, but rather than instruct Mr. H to rectify his behaviors, as he had promised Ms. Creedon he would do, Mr. Reiff began by asking Mr. H, in essence, "How can we make you more comfortable?"

154.    The meeting devolved into Mr. H complaining about Ms. Creedon.

155.    Mr. Reiff then determined that Ms. Creedon and Mr. H should engage in a "mediation" process, which he referred to as "couples therapy."

156.    Ms. Creedon felt that she had no choice but to participate despite her heightened anxiety arising out of Mr. H's conduct and the deaf ears upon which her complaints had fallen.

157.    On October 3, 2024, Mr. Reiff emailed Ms. Creedon, asking for a recap of the issues with Mr. H, and for the first time, he copied the Human Resources representative for New York, Alyssa Tavarez.

158.    Ms. Creedon responded the same day, detailing Mr. H's harassment, *and all her complaints to Mr. Reiff about the same*, including dates and other reference information.

159.    And still, nothing happened.  The Firm performed no investigation, instead relying on the so-called mediation to resolve the issue.

160.    Meanwhile, on October 17, 2024, as mentioned, *supra*, Ms. Creedon received a complaint from the Team Complainant, who was distressed by Mr. H's harassment.  The Team Complainant made Ms. Creedon aware that Mr. H had been harassing her and the other Team Complainant so badly that she had to take a "mental health day".

161.    Ms. Creedon immediately reported this to Mr. Reiff and Ms. Tavarez.

162.    Through several conversations with HR and Mr. Reiff, Ms. Creedon made clear that both she and the Team Complainant believed, in good faith, that Mr. H's harassment was gender-based.

163.    Ms. Creedon tried to diffuse the situation and protect the anonymity of the Team Complainant and Mr. H by ordering her _entire_ NY team to work from home for more than a week until an investigation could be initiated.

164.    Nevertheless, HR performed no investigation as required by Firm Anti-Harassment Policy, even though the Team Complainant, herself, corroborated Ms. Creedon's complaint to HR.

165.    When Ms. Tavarez eventually spoke to Mr. H after her discussions with the Team Complainant, Ms. Tavarez reportedly only told him to "be mindful of his tone when speaking to others".

166.    This did nothing to stop him.  To the contrary, when the team returned to working in the office, Mr. H accosted the Team Complainant about her complaint.  It also escalated his rancor toward Ms. Creedon.

167.    With no Investigation performed on behalf of the growing list of females working at or with Forvis, Ms. Creedon was not optimistic about the success of "Couples Therapy."

168.    Nevertheless, Ms. Creedon had agreed to participate and the first day of the joint mediation was scheduled for November 3, 2024.

169.    Ms. Creedon participated in the requested initial session with the mediator.

170.    But just hours before the first joint session, the meeting was unexpectedly postponed and the joint session never took place.

171.    Ms. Creedon was left in the dark as to the reason for the cancellation.

172.    It was days later, with virtually no notice, that Mr. Reiff informed Ms. Creedon that Mr. H had elected to take a leave of absence, which was to be effective the next morning.

173.    Mr. H took leave without providing the team with adequate transition assistance, as Ms. Creedon had predicted he would do.  This left Ms. Creedon to pick up the pieces of his work, all while not having been allowed to hire an additional team member in anticipation of this precise scenario.

174.    During this time, Ms. Creedon requested a copy of her employment file.

175.    The Company refused to provide it.

176.    Mr. Reiff, however, informed Ms. Creedon that *no complaints had been reported to HR about Ms. Creedon at any time.*

*Ms. Creedon Escalates her Complaints;*
*Defendants' Retaliation Escalates*

177.    Ms. Creedon had a dotted-line reporting structure to the National Nonprofit Industry Leader, Tondee Lutterman, and throughout 2024, Ms. Lutterman repeatedly reached out to Ms. Creedon, recognizing that something had been upsetting her.

178.    For most of 2024, Ms. Creedon resisted involving Ms. Lutterman in the situation with Mr. H, relying on her direct supervisor, Mr. Reiff.

179.    Nevertheless, Ms. Lutterman seemingly suspecting that Ms. Creedon was in fact disturbed and not sharing information with her, continued to reach out to Ms. Creedon by text, phone, email and Microsoft Teams messaging.

180.    Ms. Creedon's anxiety through the fall of 2024 was extraordinary. The constant worry of another altercation with Mr. H, the complete lack of support from Mr. Reiff, and the impending "Couples Therapy" was causing her to be under significant strain.

181.    And, she was working without a contract.

182.     Accordingly, on or about November 1, 2024, with a failed mediation and no investigation underway, Ms. Creedon finally reached out to Ms. Lutterman for her advice.

183.     Ms. Creedon explained the details and pervasiveness of the harassment, discrimination, and retaliation that she had been experiencing for more than a year, including her historical struggles with contract negotiation and Bonus payments.

184.     Ms. Lutterman was outraged by the conduct and noted that it was consistent with a known pattern of behavior.  Ms. Lutterman was appalled at the resulting lack of activity, investigation or disciplinary action.

185.     Ms. Lutterman advised Ms. Creedon to reach out to Mr. Gilstorf for support.

186.     Unbeknownst to Ms. Creedon at the time, Ms. Lutterman also reached out to Mr. Reiff and to Mr. Gilstorf to discuss the matter and was summarily rebuffed.  This, despite that she is not only a fellow Partner of theirs, but arguably senior to them as a Firm National Industry Line Leader.

187.     During Mr. H's leave, although the work mounted and presented significant challenges to re-allocate, Ms. Creedon's team was peaceful and content without his barrage of harassment.

188.     But then, as Mr. H was expected to return from leave, Ms. Creedon was suffering from significant anxiety, anticipating the return of his abuse.

189.     Ms. Creedon attempted to speak to Mr. Reiff about this, but he refused to engage with her.

190.    Finally, on or about November 27, 2024, after a year of advocating for herself and other women with no relief, Ms. Creedon reached out to Mr. Gilstorf for help, on the advice of Ms. Lutterman.[4]

191.    Mr. Gilstorf indicated that he had already known of Ms. Creedon's complaints about Mr. H but was unaware of her lapsed contract.  Undeterred, Ms. Creedon pressed on with the full facts, ultimately causing Mr. Gilstorf to acknowledge that this was, in fact, sexual harassment.

192.    Mr. Gilstorf pledged to resolve the harassment.

193.    Mr. Gilstorf also stated that the lack of clarification about her contract was unacceptable and that he would rectify that, as well.

194.    Mr. Gilstorf insisted that the Firm was *not* trying to push Ms. Creedon to resign, reiterating how much both he and the Firm valued her.

195.    Ms. Creedon's complaints to Mr. Gilstorf and Ms. Lutterman finally drew the Firm's attention.  On December 3, 2024, HR and "People Services" personnel supposedly launched an Investigation into Mr. H's behavior.

196.    On December 13, 2024, Chief Risk Officer, Mike Wolfe, informed Ms. Creedon that Mr. H's behavior had been unacceptable and that the Firm had terminated his employment, effective immediately.

197.    But then, in that very same conversation, he fired Ms. Creedon.

---

[4] Ms. Creedon's acts were in accordance with the Company's policies which not only permit, but in many instances *mandate* reporting up the chain of command in the event that sexual harassment is not being addressed by an immediate supervisor, and prohibits retaliation on the basis of the same.

198.    Mr. Wolfe informed Ms. Creedon that she was being terminated *because of her protected complaints to Ms. Lutterman and Mr. Gilstorf*.

199.    Those complaints, he said, rendered Ms. Creedon "no longer a culture fit" for the Firm.

200.    But "culture fit," was nothing more than coded language for retaliation.

201.    It is preposterous that Ms. Creedon was not a "culture fit," when, just months earlier, the Firm had nominated her for its 2024 Key Award Partner—an award celebrating a "builder of [Firm] culture."

202.    Additionally, despite Mr. Wolfe's statement that Ms. Creedon was terminated for being a bad culture fit, throughout 2024 and early 2025, Ms. Creedon was invited to leadership positions, speaking engagements, and other roles of influence on behalf of the Firm, including:

   a.    Being asked to lead the National Nonprofit "Center of Excellence" Committee;

   b.    Being invited to join the Center of Excellence Committee as an advisory member—this, underscore after her first termination meeting;

   c.    Taking over as the head of the National Technology & Services Outsourced Accounting Services Team;

   d.    Being invited to join the Firm's Tech and Services Industry Subcommittee;

   e.    Being asked to film external facing promotional videos for her Digital Practice, her Advisory Practice, and her Tech & Services Practice;

   f.    Being recognized in no fewer than 5 internal "Bravo" peer and staff recognition awards;

   g.    Authoring multiple nationally-published articles, and presenting at numerous Forvis and external conferences and webinars;

h.  Being asked to speak to staff and partners at the annual Forvis leadership conference in at least four separate leadership and informational sessions across the Nonprofit, OAS and Tech & Services groups;

i.  Being asked to spearhead the relaunch of a Northeast region's Nonprofit Advisory Services Practice; and

j.  Being asked to mentor 2 new individuals.

203.   The story is simple—Ms. Creedon made good faith protected complaints about sexual harassment and discrimination and was fired as a result—a textbook case of illegal retaliation.

204.   However, rather than effectuate the dismissal, Mr. Wolfe requested that Ms. Creedon remain at Forvis through the end of the fiscal year, May 31, 2025, for "transition purposes."

205.   This, too, belies the idea that Ms. Creedon posed a threat to the Firm's culture.[5]

*The Retaliation Continued Post-Termination*

206.   Despite the humiliation of being put on notice of her termination, Ms. Creedon agreed to stay on for the transition period, winning new business and several million dollars in total revenue *after* she had been advised of her termination.

207.   During this time, in early 2025, Ms. Creedon and Mr. Wolfe attempted to negotiate the terms of her exit.

---

[5]Ms. Creedon later came to learn that immediately after her ouster, on or about December 17, 2024, Mr. Reiff seemingly sought to discredit her by spreading false information about the performance of her Practice in yet another manner of retaliating against her at a firm-wide leadership meeting.

208.    The Firm rejected the reasonable terms proposed by Ms. Creedon, and rather than negotiate, on March 3, 2025, Mr. Wolfe abruptly terminated Ms. Creedon for a second time—this time, effective immediately.

209.    Since that time, the Firm has insisted, despite her wrongful termination, that Ms. Creedon is bound by certain restrictive covenants set forth in her expired employment agreement.

210.    As an initial matter, the restrictive covenants are, in and of themselves, too broad to be enforceable under New York law.

211.    The restrictive covenants are not necessary for the protection of Forvis' legitimate business interests, are not appropriately limited as to time and geography, scope and breadth, and have rendered it extraordinarily difficult, if not impossible, for Ms. Creedon to maintain her income. *See* Exhibit B.

212.    In addition, the restrictive covenants included in Ms. Creedon's expired contract are not enforceable because she was terminated without cause, and in fact because she was subject to a wrongful termination. *King v. Marsh & McLennan Agency, LLC*, 191 A.D.3d 507 (1st Dep't 2021); *Kolchins v. Evolution Mkts., Inc.*, 182 A.D.3d 408 (1st Dep't 2020); *Buchanan Capital Mkts., LLC v. DeLucca*, 144 A.D.3d 508 (1st Dep't 2016).

213.    The restrictive covenants are unenforceable. Ms. Creedon suffered extreme emotional harm as a result of her experience with Forvis.

<u>**FIRST CAUSE OF ACTION**</u>
**Discrimination and Harassment in Violation of Title VII**
**(Against all Defendants)**

214.    Defendants unlawfully discriminated against and harassed Ms. Creedon in the

terms and conditions of her employment by subjecting her to disparate treatment, adverse actions, and termination of her employment on the basis of her sex, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 USC § 2000e et seq. ("Title VII").

215.    As a direct and proximate result of the unlawful conduct, Ms. Creedon has suffered and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

216.    As a direct and proximate result of the unlawful conduct, Ms. Creedon has suffered and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief, in an amount to be determined at trial.

217.    As a result, Ms. Creedon has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

218.    Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Ms. Creedon's federally protected rights.

219.    Ms. Creedon is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

### SECOND CAUSE OF ACTION:
**Retaliation in Violation of Title VII
(Against all Defendants)**

220.    Ms. Creedon repeats and realleges each allegation set forth above.

221.    Defendants unlawfully retaliated against Ms. Creedon for her protected discrimination and harassment complaints in violation of Title VII.

222.    As a result, Ms. Creedon has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

223.    Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Ms. Creedon's federally protected rights.

224.    Ms. Creedon is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

**THIRD CAUSE OF ACTION**
**Discrimination and Harassment Under the NYSHRL § 296(1)**
**(Against all Defendants)**

225.    Ms. Creedon repeats and realleges each allegation set forth above.

226.    Defendants unlawfully discriminated against Ms. Creedon in the terms and conditions of her employment by subjecting her to disparate treatment and adverse actions on the basis of her gender including termination in violation of the New York State Human Rights Law, N.Y. Exec Law § 296(1) ("NYSHRL").

227.    As a direct and proximate result of the unlawful conduct, Ms. Creedon has suffered and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

228.    As a direct and proximate result of the unlawful conduct, Ms. Creedon has suffered and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief, in an amount to be determined at trial.

229.    Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Ms. Creedon's rights.

230.     Ms. Creedon is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

### FOURTH CAUSE OF ACTION
**Retaliation Under the NYSHRL, § 290 *et seq.***
**(Against all Defendants)**

231.     Ms. Creedon hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

232.     By the actions described above, among others, Defendants retaliated against Ms. Creedon in violation of the NYSHRL.

233.     As a direct and proximate result of the unlawful conduct, Ms. Creedon has suffered and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

234.     As a direct and proximate result of the unlawful conduct, Ms. Creedon has suffered and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief, in an amount to be determined at trial.

235.     Defendants committed these unlawful acts with willful negligence, or recklessness, or a conscious disregard of Ms. Creedon's rights for which Ms. Creedon is entitled to an award of punitive damages.

### FIFTH CAUSE OF ACTION
**Aiding and Abetting in Violation of NYSHRL, § 290 *et seq.***
**(Against Reiff, Wolfe, and Gilstorf)**

236.     Ms. Creedon hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

237.     Defendants Reiff, Wolfe, and Gilstorf engaged in an unlawful discriminatory

practice against Plaintiff on account of her gender, by knowing and/or recklessly aiding, abetting,

compelling, coercing and/or actively participating in the unlawful, discriminatory and retaliatory

conduct in violation of the NYSHRL, N.Y. Exec. Law § 296 (6).

238.    As a direct and proximate result of the unlawful conduct, Ms. Creedon has suffered

and continues to suffer, severe mental anguish and emotional distress, including, but not limited

to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and

emotional pain and suffering.

239.    As a direct and proximate result of the unlawful conduct, Ms. Creedon has suffered

and continues to suffer, monetary and/or other economic harm for which she is entitled to an award

of monetary damages and other relief, in an amount to be determined at trial.

240.    Defendants willfully engaged in discriminatory practices with malice and/or

reckless indifference to Ms. Creedon's rights.

241.    Ms. Creedon is entitled to an award of emotional distress damages, compensatory

damages, economic damages, punitive damages, attorneys' fees and costs, in an amount to be

determined at trial.

**<u>SIXTH CAUSE OF ACTION</u>**
**Discrimination and Harassment in Violation of the NYCHRL, § 8-107 *et seq.***
**(Against all Defendants)**

242.    Ms. Creedon hereby repeats, reiterates and re-alleges each and every allegation as

contained in each of the preceding paragraphs as if fully set forth herein.

243.    Defendants have discriminated against and harassed Ms. Creedon in violation of

the New York City Human Rights Law by denying her equal terms and conditions of employment,

including but not limited to, disciplining her, failing to properly compensate her, refusing to engage

in contract negotiations, defaming her and terminating her, despite her qualifications, because of Ms. Creedon's gender.

244.    As a direct and proximate result of the unlawful conduct, Ms. Creedon has suffered and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

245.    As a direct and proximate result of the unlawful conduct, Ms. Creedon has suffered and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief, in an amount to be determined at trial.

246.    Ms. Creedon is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and cost, in an amount to be determined at trial.

### SEVENTH CAUSE OF ACTION
### Retaliation Under the NYCHRL, § 8-107 *et seq.*
### (Against all Defendants)

247.    Ms. Creedon hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

248.    By the actions described above, among others, Defendants retaliated against Ms. Creedon in violation of the New York City Human Rights Law.

249.    As a direct and proximate result of the unlawful conduct, Ms. Creedon has suffered and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

250.    As a direct and proximate result of the unlawful conduct, Ms. Creedon has suffered

and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

251.    As a direct and proximate result of the unlawful conduct, Ms. Creedon has suffered and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief, in an amount to be determined at trial.

252.    Defendants committed these unlawful acts with willful negligence, or recklessness, or a conscious disregard of Ms. Creedon's rights for which Ms. Creedon is entitled to an award of punitive damages, in an amount to be determined at trial.

253.    Ms. Creedon is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and cost, in an amount to be determined at trial.

### EIGHTH CAUSE OF ACTION
### Aiding and Abetting Under the NYCHRL, § 8-107 *et seq.*
### (Against Reiff, Wolfe, and Gilstorf)

254.    Ms. Creedon hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

255.    Defendants Reiff, Wolfe, and Gilstorf engaged in an unlawful discriminatory practice against Ms. Creedon on account of her gender, by knowing and/or recklessly aiding, abetting, compelling, coercing and/or actively participating in the unlawful, discriminatory and retaliatory conduct in violation of the New York City Human Rights Law.

256.    As a direct and proximate result of the unlawful conduct, Ms. Creedon has suffered and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

257.     As a direct and proximate result of the unlawful conduct, Ms. Creedon has suffered and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief, in an amount to be determined at trial.

258.     Defendants Reiff and Wolfe willfully engaged in discriminatory practices with malice and/or reckless indifference to Ms. Creedon's rights.

259.     Ms. Creedon is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorneys' fees and costs, in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
### Violation of New York Labor Law §740 – Whistleblower Protection
### (Against all Defendants)

260.     Ms. Creedon hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

261.     Ms. Creedon engaged in protected whistleblower activities by raising concerns about illegal and improper conduct at the Company, including sexual harassment and retaliation in violation of Title VII, the NYSHRL and NYCHRL.

262.     In retaliation for Plaintiff's whistleblower activities, Defendants refused to engage in contract negotiations with Plaintiff, and ultimately terminated Plaintiff's employment.

263.     Defendants' actions violated the whistleblower protections afforded under New York Labor Law § 740.

264.     As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered damages, including lost wages, emotional distress, and damage to her professional reputation, in an amount to be determined at trial.

265.     Plaintiff is also entitled to punitive damages as a result of Defendants' conduct.

## TENTH CAUSE OF ACTION
### Declaratory Judgment
### (Against Forvis)

266.    Ms. Creedon hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

267.    Ms. Creedon and Forvis signed the Employment Agreement which purports to restrict Ms. Creedon from soliciting certain clients, employees of Forvis, and interfering with certain business activities of Forvis (the "Restrictive Covenants").  See Exhibit B at §11.

268.    Forvis has asserted that the Restrictive Covenants are enforceable.

269.    The Restrictive Covenants are too broad to be enforceable at law, and, if found enforceable, would prevent Ms. Creedon from engaging in meaningful employment.

270.    Moreover, as a result of Ms. Creedon's wrongful and illegal retaliatory termination, the Restrictive Covenants, even if they were enforceable (which they are not) are no longer enforceable at law.  *King v. Marsh & McLennan Agency, LLC*, 191 A.D.3d 507 (1st Dep't 2021); *Kolchins v. Evolution Mkts., Inc.*, 182 A.D.3d 408 (1st Dep't 2020); *Buchanan Capital Mkts., LLC v. DeLucca*, 144 A.D.3d 508 (1st Dep't 2016).

271.    Forvis' assertion that the Restrictive Covenants are enforceable creates a justiciable controversy.

272.    As a result of Forvis' actions, Ms. Creedon is entitled to a declaratory judgment that the Restrictive Covenants are not enforceable.

273.    Because the issue surrounding Ms. Creedon's Restrictive Covenants are part of the same case and controversy as her gender-based termination, the matter cannot be compelled to mandatory arbitration pursuant to the Ending Forced Arbitration Act.

274.    Accordingly, Ms. Creedon respectfully requests that the Court declare the Restrictive Covenants to be unenforceable.

## ELEVENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Against all Defendants)

275.    Ms. Creedon hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

276.    During Ms. Creedon's employment at Forvis, Defendants demeaned, harassed, discriminated against, and terminated Ms. Creedon which caused Ms. Creedon significant and severe emotional distress.

277.    Defendants' abuse included demeaning language, intimidation, threats, bullying, retaliation and toxic behavior.

278.    As a direct and proximate cause of Defendants' actions, Ms. Creedon experienced humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

279.    In addition to compensatory damages for intentional infliction of emotional distress, Defendants' aforementioned conduct was intentional, deliberate and so outrageous that an award of punitive damages is necessary to vindicate the rights of the public and deter the commission of similar acts in the future.

## PRAYER FOR RELIEF

Wherefore, the Ms. Creedon prays that the Court enter judgment and relief as follows:

a.    Declaring that the acts and omissions complained of herein are unlawful and violate Title VII, the NYSHRL, and the NYCHRL;

b.    Awarding Ms. Creedon compensatory damages, in an amount to be determined at trial to make Ms. Creedon whole and for her lost wages, back pay, front pay, humiliation, mental anguish, and emotional distress;

c.  Awarding Ms. Creedon punitive damages in an amount to be determined at trial;

d.  Awarding Ms. Creedon attorney's fees, costs, and expenses incurred in the prosecution of this action;

e.  Issuing a declaration that the Restrictive Covenants are unenforceable; and

f.  Awarding Ms. Creedon such other and further relief as the Court may deem equitable, just, and proper to remedy Defendants' actions.


Dated: New York, New York
October 15, 2025


                                        KALMANSON COHEN, PLLC

                                        _____/s/ Randi M. Cohen_
                                        Randi M. Cohen
                                        Kimberly Kalmanson
                                        165 Broadway, 23rd Floor
                                        New York, NY 10006
                                        T: (646) 759 3655 | F: 646 513 2936
                                        kim@kalmansoncohen.com
                                        randi@kalmansoncohen.com
                                        http://www.kalmansoncohen.com
                                        *Attorneys for Plaintiff, Corinna Creedon*